369 A.2d 829

**Carl M. MAZZOCONE et al., Appellees,**

**v.**

**Helen WILLING, Appellant.**

Superior Court of Pennsylvania.

Argued March 18, 1976.

Decided Nov. 22, 1976.

Petition Granted Feb. 15, 1977.

100

Henry J. Sommer, Philadelphia, for appellant.

Harold B. Marcus, Philadelphia, for appellees.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

CERCONE, Judge:

This is an appeal from the following final decree of the court below sitting in equity:

"AND NOW, to wit, this 10th day of November, 1975, following a full and final hearing on the merits, it is hereby Ordered and Decreed that the Defendant herein, Helen R. Willing, be and is permanently enjoined from further demonstrating against and/or picketing Mazzocone and Quinn, Attorneys-at-Law, and from uttering or publishing defamatory, slanderous or libelous matter with respect to said attorneys."

As modified the decree is affirmed.

The record reveals that plaintiff's request for equitable relief was precipitated by the following undisputed facts: For several hours on Monday, September 29, and Wednesday, October 1, 1975, defendant demonstrated in front of the entrance to Number Two Penn Center Plaza —an office building located in Centre City, Philadelphia in which plaintiffs maintained their law offices. Defendant's demonstration consisted of her pushing a shopping cart while ringing a cow-bell and blowing on a

whistle.[1]  While so engaged defendant wore a sign in the form of a sandwich board which read:

LAW–FIRM
OF
QUINN–MAZZOCONE
*STOLE–MONEY FROM ME*
AND SOLD ME OUT TO
THE INSURANCE COMPANY

When the plaintiffs' attempts to amicably terminate defendant's demonstrations failed, they instituted this action in equity to enjoin defendant's conduct.

The evidence before the Chancellor established, among other things, that plaintiffs, a two-member law firm, were retained by defendant in 1968 to prosecute her claim for workmen's compensation benefits.  Although plaintiffs secured a favorable decision for defendant, it was ironically this event which spawned her animosity towards them.[2]  Specifically, defendant developed the belief that plaintiffs wrongfully diverted to themselves $25.00 of the settlement proceeds.  This conviction apparently arose out of some confusion regarding the payment of $150.00 which, according to plaintiff's distribution schedule, was made to the defendant's treating psychiatrist, Dr. DeSilverio.  Defendant maintains that plaintiffs only paid Dr. DeSilverio the sum of $125.00.[3]  In reply to this contention, plaintiffs introduced into evidence their records relating to Dr. De-

---

1. In this connection, it is to be noted that an occupant of Three Penn Center Plaza testified that the noise created by the defendant was so distracting that he and his thirty employees could not work, and that he had to close the office.

2. Defendant was awarded permanent/partial disability benefits.

3. It is interesting to note that defendant never registered any ⁻omplaint about the distribution until her instant activities.  Significantly, these occurred shortly after the Commonwealth Court dismissed her claim for total disability benefits, a claim which plaintiffs refused to prosecute because of their opinion that same was unwarranted.

Silverio, including cancelled checks. Furthermore, any possible doubt as to the truth or falsity of defendant's allegations was dispelled by Dr. DeSilverio himself, who testified that plaintiffs had indeed paid him $150.00 for his services. Defendant made no attempt to contradict or refute this evidence, but simply repeated her belief that plaintiffs had defrauded her out of $25.00, and no proof to the contrary would erase this conviction.

As the lower court well stated:

"Thus, the evidence adduced clearly establishes that defendant is a woman firmly in the thrall of the belief that plaintiffs defrauded her, an *idee fixe*, which, either by reason of eccentricity or an even more serious mental instability, refuses to be dislodged by the most convincing proof to the contrary. It is equally clear that unless stayed by this Court, defendant will resume her bizarre parade before plaintiffs' office building, displaying her defamatory accusation which will not only offer plaintiffs continuous embarrassment and humiliation but do serious injury to their professional reputation as well."

Defendant's challenge to the lower court's injunction is predicated on the traditional view that equity does not have the power to enjoin the publication of defamatory matter. *Alberti v. Cruise*, 383 F.2d 268 (4th Cir. 1967); *Crosby v. Bradstreet*, 312 F.2d 483 (2d Cir. 1963); *Kukatush Mining Corp. v. Securities and Exchange Com'n.*, 114 U.S.App.D.C. 27, 309 F.2d 647 (1962); *Robert E. Hicks Corp. v. National Salesman's Training Corp.*, 19 F.2d 963 (7th Cir. 1927); *Greenberg v. DeSalvo*, 254 La. 1019, 229 So.2d 83 (1969), cert. denied, 397 U.S. 1075, 90 S.Ct. 1521, 25 L.Ed.2d 809 (1969); *Prucha v. Weiss*, 233 Md. 479, 197 A.2d 253 (1964), cert. denied, 377 U.S. 992, 84 S.Ct. 1916, 12 L.Ed.2d 1045 (1964); *Kwass v. Kersey*, 139 W.Va. 497, 81 S.E.2d 237 (1954); *Kivett v. Nevils*, 190 Tenn. 12, 227 S.W.2d 39 (1950); *Gariepy v. Springer*, 318 Ill.App. 523, 48 N.E.2d 572 (1943). See gener-

ally Annot., 47 A.L.R.2d 715 (1956). These cases indicate the reasons why equity has traditionally declined to enjoin defamation: (1) equity will afford protection only to property rights; (2) an injunction would deprive the defendant of his right to a jury trial on the issue of the truth of the publication; (3) the plaintiff has an adequate remedy at law; and (4) an injunction would be unconstitutional as a prior restraint on freedom of expression. However, the logic and soundness of these reasons have been severely criticized by numerous commentators.[4] Our own analysis compels us to conclude that blind application of the majority view to the instant case would be antithetical to equity's historic function of maintaining flexibility and accomplishing total justice whenever possible.

First of all, the concept that equity will protect only property rights as opposed to personal rights has been expressly repudiated by our Supreme Court. See *Everett v. Harron*, 380 Pa. 123, 110 A.2d 383 (1955). In any event, the right to practice law is a property right. *Montgomery County Bar Ass'n v. Rinalducci*, 329 Pa. 296, 197 A. 924 (1938).

The second objection often advanced for refusing to enjoin defamation is that the defendant would be denied the right to have a jury pass upon the truth or falsity of the publication. This argument loses all persuasion, however, in those situations where the plaintiff has clearly established before a judicial tribunal that the matter sought to be enjoined is both defamatory and false. In the words of Dean Pound, a jury trial in such a case is a "mere form" and "is no more an obstacle than in the case of equity jurisdiction to enjoin trespass, disturbance of

4. See Pound, *Equitable Relief against Defamation and Injuries to Personality*, 29 Harv.L.Rev. 640 (1916); Sedler, *Injunctive Relief and Personal Integrity*, 9 St. Louis U.L.J. 147 (1964); Note, *Developments in the Law: Injunctions*, 78 Harv.L.Rev. 994, 1011–12 (1965); Bertelsman, *Injunctions Against Speech and Writing: A Re-Evaluation*, 59 Kent L.J. 319 (1970).

easements or nuisance." *Pound*, supra, Note 4, at 657. In short, the jury trial objection vanishes where there are no controverted issues of fact to submit to the jury. In the case at bar, the evidence established that the defendant's sign accusing plaintiffs of stealing money from her and selling her out to the insurance company was both false and malicious. Indeed, defendant never attempted to dispute or contradict plaintiffs' evidence, but rather continuously relied upon the "defense" that equity will not enjoin defamation. To refuse injunctive relief under the circumstances of this case on the grounds that defendant would be denied a jury trial is to elevate form over substance.

■ The third argument often invoked for denying injunctive relief in defamation cases is that the plaintiff has an adequate remedy at law. This reason is premised on the theory that an award of damages will sufficiently recompense the plaintiff for any harm occasioned by the defamatory publication. See 42 Am.Jur.2d, Injunctions, § 136. We, however, have difficulty accepting the idea that the payment of a sum of money is either an adequate or proper remedy in this case. In the first instance, it is obvious that a good professional and/or personal reputation is a unique and precious possession. Damage to this inestimable possession is, however, difficult to prove and measure accurately; in fact, in most cases, more difficult than measuring property damages, *Everett v. Harron*, supra. More importantly, we cannot disregard the fact that in the present case an action for damages would be a pointless gesture since the defendant is indigent. In the case of *Heilman v. The Union Canal Company*, 37 Pa. 100, 104 (1860), which was an action to restrain a canal company from diverting and using the water of a creek, the Court held that "the insolvency of the defendants, is not *of itself* a ground of equitable interference." [Emphasis added.] However, in the instant action not only do we have the defendant's insolvency but, as pointed out above, we also have the difficulties inher-

ent in attempting to measure in dollars the damage caused by defendant. An additional consideration militating in favor of equitable jurisdiction is the avoidance of a multiplicity of suits. In view of the defendant's unshakeable conviction that plaintiffs have defrauded her, it is not unreasonable to assume that unless restrained she will persist in conducting her defamatory demonstrations secure in the knowledge that any monetary judgment would be unenforceable. To permit this would place plaintiffs in the oppressive position of resorting to ineffective actions at law whenever the defendant is inclined to denigrate them. Clearly this cannot be an "adequate remedy at law." *Everett v. Harron,* supra.

The final reason frequently advanced for equity's reluctance to enjoin defamation is that an injunction against the publication would be unconstitutional as a prior restraint on free expression. This is by far the most cogent of all the reasons offered in support of the traditional view. However, as Mr. Justice Frankfurter observed:

> "The phase 'prior restraint' is not a self-wielding sword. Nor can it serve as a talismanic test. The duty of closer analysis and critical judgment in applying the thought behind the phrase has thus been authoritatively put by one who brings weighty learning to his support of constitutionally protected liberties: 'What is needed,' writes Professor Paul A. Freund, 'is a pragmatic assessment of its operation in the particular circumstances. The generalization that prior restraint is particularly obnoxious in civil liberties cases must yield to more particularistic analysis.' The Supreme Court and Civil Liberties, 4 Vand.L.Rev. 533, 539." *Kingsley Books, Inc. v. Brown,* 354 U.S. 436, 441–442, 77 S.Ct. 1325, 1328, 1 L.Ed.2d 1469 (1957).

Justice Frankfurter gives strong viability to the minority view, if such is the case, that a pragmatic and modern rather than a theoretical and historical approach should

be made in deciding the justiciability of an injunction against defamatory publications.

■ Of course, the Supreme Court has never declared that all injunctions of speech do not pass constitutional muster. This circumspection necessarily derives from the realization that the peculiar facts of a particular case may admit of no other alternative but injunction. We submit that this is such a case. Here we have a situation where an indigent person persists in defaming the plaintiffs despite the fact that her allegations have been irrefutably demonstrated to be untrue. Indeed, the evidence of their untruth is so overwhelming that one can only infer that the defendant's intent is purely malicious. Furthermore, her indigence allows her to proceed without fear of having to pay for her defamations; there is no economic incentive here for self-censorship. Similarly, her indigence deprives the plaintiffs of any fund upon which they might draw to repair, in some measure, the damage already done to their business and reputations. Hence, the suggestion is that the constitution requires the plaintiffs to endure a continuing and utterly false attack upon their reputations without affording any relief whatsoever, monetarily or otherwise. We cannot agree that the constitution permits any such inverse condemnation of these valuable personal rights.

"The public interest in freedom of speech is degraded when it is used as a shield for tortious harms caused by statements of a wholly private significance." Restatement, Torts § 942, comment d (1939).

Furthermore, there is an inconsistency with the majority view in that it approves injunctions in trade libel cases and frowns on injunctions against defamatory publications concerning the reputation of an individual. Purchasers have been enjoined from adorning their cars with drawings of lemons and similar decorations or against advertising the identification of a vendor. *Carter v. Knapp Motor Co.*, 243 Ala. 600, 11 So.2d 383

(1943); *Menard v. Houle*, 298 Mass. 546, 11 N.E.2d 436 (1937); *Saxon Motor Sales, Inc. v. Torino*, 166 Misc. 863, 2 N.Y.S.2d 885 (1938). Demonstrative tenants have been restrained from picketing their landlord. *Springfield Bayside Corporation v. Hochman*, 44 Misc.2d 882, 255 N.Y.S.2d 140 (1964). The owner of a hospital has been protected against the disparagement of that facility. *Wolf v. Gold*, 9 A.D.2d 257, 193 N.Y.S.2d 36 (1959). The business interests of a real estate developer have been protected. *West Willow Realty Corp. v. Taylor*, 23 Misc. 2d 867, 198 N.Y.S.2d (1960). See generally 42 Am.Jur. 2d, supra.

There is definitely a curious inversion of logic in the view that gives property rights primacy over personal rights involving reputation. There is an equal involvement of freedom of speech and expression in both categories of cases; and yet, equity will give relief in one and withhold it in the other on grounds that equitable relief in personal defamation cases would derogate the right to freedom of speech. That there is an incongruity in this kind of reasoning needs no lengthy disposition or argument. There is as much threat in the potential destruction of a person's good name through malicious falsehoods as there is in coercive and threatening measures taken against one's property rights.

We are fully aware that equity cannot enjoin every utterance or publication, whether it be in a trade libel or a defamation case. Each case must stand on its own facts. An injunction will not issue when it is not in the public interest to do so. The pivotal question and its solution depend on the presence or absence of an overriding public interest in the utterance or publication. In *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed. 2d 296 (1971) the court stated:

"It is clear that there has emerged from our cases decided since *New York Times* [*New York Times v. U. S.*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822] the

concept that the First Amendment's impact upon state libel laws derives not so much from whether the plaintiff is a 'public official,' 'public figure,' or 'private individual,' as it derives from the question whether the allegedly defamatory publication concerns a matter of public or general interest."

Where the public interest is minimal or non-existent then a publication, which is also defamatory and unprivileged should be enjoined.

In the case at bar, we perceive no public interest so substantial or significant as to permit defendant's continuing false accusations concerning plaintiff's professional conduct. On the other hand, the injury to plaintiff's reputation can be extensive and irreparable if the defendant is permitted to continue her activities. Under these circumstances, the court below properly granted the injunction.

■ While we have concluded that the injunction was properly issued, we must agree with defendant's contention [5] that the decree is constitutionally offensive insofar as it curtails any form of expression. It is well established that:

"The entry of an injunction is, in some respects, analogous to the publication of a penal statute. It is a notice that certain things must be done or not done, under a penalty to be fixed by the court. * * * Such a decree should be as definite, clear, and precise in its terms as possible, so that there may be no reason or excuse for misunderstanding or disobeying it; and, when practicable, it should plainly indicate to the defendant all of the acts which he is restrained from doing, without calling upon him for inferences or conclusions about which persons may will differ."

5. Given the fact that we have modified the chancellor's decree and that the material facts are undisputed, the defendant's final contention—that the court below was lacking in fairness and impartiality—has no merit.

*Collins v. Wayne Iron Works*, 227 Pa. 326, 330, 76 A. 24, 25 (1910); *accord. Apple Storage Co. v. Consumers Education & Pro. Ass'n.*, 441 Pa. 309, 272 A.2d 496 (1971). In the instant case, the decree is not sufficiently precise. It is too broad since it imposes sanctions beyond the scope of her activities which have been adjudged defamatory and false in this case. The decree must be modified [6] to read as follows:

"Helen R. Willing, be and is permanently enjoined from further demonstrating against and/or picketing Mazzocone and Quinn, Attorneys-at-Law, by uttering or publishing statements to the effect that Mazzocone and Quinn, Attorneys-at-Law stole money from her and sold her out to the insurance company."

Accordingly, the decree entered by the court below as modified is hereby affirmed.

JACOBS, J., files a dissenting opinion in which HOFFMAN and SPAETH, JJ., join.

JACOBS, Judge, dissenting:

I must respectfully dissent.

This is an appeal from a final decree of the Court of Common Pleas of Philadelphia County enjoining defendant-appellant Helen Willing from uttering defamatory statements about appellees and from picketing their law offices. I do not believe that appellees are entitled to injunctive relief and I would therefore vacate the decree entered below.

Appellees are a two-member law firm with offices located at Room 612, Number Two Penn Center Plaza, Philadelphia. In 1968, appellant was represented by appellees in a claim for workman's compensation benefits. The proceedings relating thereto ultimately resulted in a decision favorable to appellant. Appellees' distribution

6. See *Liberty Corporation v. D'Amico*, 457 Pa. 181, 329 A.2d 222 (1974).

of the settlement proceeds in that matter form the background for the instant controversy.

Based on her belief that appellees had wrongfully diverted $25.00 of the settlement proceeds, appellant, on September 29 and October 1, 1975, commenced demonstrating in front of appellees' office building.[1] Appellant's activities lasted for several hours on each of the two days involved and consisted of pushing a shopping cart adorned with the American flag to and fro, of ringing a cow bell, and of blowing a whistle. She did so while wearing a sign accusing appellees of having stolen money from her and having sold her out to an insurance company. These activities were accomplished without obstruction or violence and appellant made no demands upon appellees in relation thereto. Her demonstration precipitated neither breaches of peace nor fights or disturbances in breach of peace.

On September 30, 1975 appellees filed a complaint in equity seeking to enjoin "the defendant or any of her agents preliminarily until hearing on the matter and perpetually thereafter from: . . . picketing, demonstrating, carrying placards, uttering defamatory statements or engaging in any other conduct which interferes in any way with the activities of plaintiffs . . . ; or defames the reputation of plaintiffs . . . ." Hearings were thereafter held, on October 3, October 22, and on November 3, 1975, and a final decree was entered on November 10, 1975 permanently enjoining appellant from demonstrating against and/or picketing the appellees and from uttering or publishing defamatory, slanderous or libelous matter with respect to them.[2]

1. Appellant demonstrated in the pedestrian plaza located between the buildings Two and Three Penn Center Plaza, bounded by 15th and 16th Streets, Market Street and John F. Kennedy Boulevard, Philadelphia. The location is adjacent to City Hall and the Philadelphia courtrooms. Brief for Appellees at 2.

2. At the hearings it was established that the dispute over the $25.00 centered around appellee's payment, in accordance with a

The lower court, in its opinion, determined that appellant's accusations were unfounded and inaccurate and held that ".  .  . unless stayed by this Court, defendant will resume her bizarre parade before plaintiffs' office building, displaying her defamatory accusation which will not only offer plaintiffs continuous embarrassment and humiliation but do serious injury to their professional reputation as well." The court below went on to state that "[i]n our view, this behavior falls well within equity's traditional powers of interdiction", concluding that "[c]ertainly, plaintiffs here are threatened with injury that will be substantial and irreversible" and that the defendant's "impoverishment makes any recourse to law an empty remedy.  .  .  ."

The action taken below was clearly erroneous. Injunctive relief for defamation is simply not within "equity's traditional powers of interdiction". It is the general rule in Pennsylvania and in an overwhelming majority of other jurisdictions that, absent independent grounds for equitable jurisdiction, equity lacks the power to issue an injunction restraining the publication of defamatory matter. This long-standing rule may be summarized by reference to the following statement of law, which is particularly appropriate to the instant case: "Equity does not have jurisdiction to act for the sole purpose of restraining the publication or utterance of a libel or slander, regardless of whether the defamation is personal or relates to a property right. Nor will a publication be enjoined merely because it is false, misleading, or amounts to nothing more than an expression of opinion. The jurisdiction of equity is necessarily somewhat limited, for

distribution schedule, of $150.00 to Doctor DeSilverio, the appellant's treating psychiatrist. Appellant's claim was that Doctor DeSilverio was actually paid only $125.00. Appellees introduced their original records into evidence, including cancelled checks evidencing payment to Doctor DeSilverio. In addition, Doctor DeSilverio was called as a witness, testifying that he was paid in accordance with appellee's records. Appellant offered no evidence to contradict appellees' evidence, but took the stand to reiterate her belief that appellees had cheated her out of $25.00.

any attempted censorship by the court through the writ of injunction is no less objectionable than is the exercise of that function by other departments of the government; such censorship is in effect prohibited by constitutional guaranties of freedom of speech and of the press, and by the constitutional right of trial by jury. The insolvency of the wrongdoer in such cases is not regarded as sufficient of itself to authorize such interference. . . ."

There are a few exceptions to the rule prohibiting an injunction against libel or slander. For example, an injunction may be granted where the false statements are part of a conspiracy to injure, or where there is intimidation or coercion. ". . . After a plaintiff has, by a judgment at law, established the fact that certain published statements are libelous, he may, on a proper showing, have an injunction to restrain any further publication of the same or similar statements. . . ." 42 Am.Jur.2d Injunctions § 135 (1969) (footnotes omitted). *See* 43 C.J.S. Injunctions § 134 (1945); 18 P.L.E. Injunction § 26 (1959).

The preceding general rule has been specifically followed in Pennsylvania, in *Baltimore Life Insurance Company v. Gleisner*, 202 Pa. 386, 51 A. 1024 (1902), and my research has disclosed no decision suggesting subsequent adoption of a contrary rule. See *Ashinsky v. Levenson*, 256 Pa. 14, 100 A. 491 (1917); *Frick v. Stevens*, 43 Pa. D. & C.2d 6 (C.P.Cumb.1967); *McGinnis v. Duggan*, 112 P.L.J. 48 (Pa.C.P.1963). *See also Kraemer Hosiery Co. v. American Fed'n of Full Fashioned Hosiery Workers*, 305 Pa. 206, 157 A. 588 (1931). Moreover, it is the rule of and has been consistently followed in the federal courts. *Kidd v. Horry*, 28 F. 773 (C.C.Pa.1886). *See United States v. Doe*, 455 F.2d 753, 759 n. 4 (1st Cir. 1972). *See also Organization For A Better Austin v. Keefe*, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971). Furthermore, the general rule above stated has been uni-

versally applied to deny injunctions in cases in other states in which the parties and/or activities involved were substantially similar to those present in the case at bar. *See Gariepy v. Springer*, 318 Ill.App. 523, 48 N.E. 2d 572 (1943) (defendant circulating letters to plaintiff attorney's clients, defaming him); *Greenberg v. DeSalvo*, 254 La. 1019, 229 So.2d 83, *cert. denied*, 397 U.S. 1075, 90 S.Ct. 1521, 25 L.Ed.2d 809 (1969) (defendant calling attorney "crook", "crooked attorney", etc.); *Schmoldt v. Oakley*, 390 P.2d 882 (Okl.1964) (displaying sign on street near plaintiff's business disparaging auto sold to defendants by plaintiff); *Stansbury v. Beckstrom*, 491 S.W.2d 947 (Tex.Civ.App.1973) (defendant parading, standing, sitting or lying in front of physician's office displaying libelous and false signs); *Kwass v. Kersey*, 139 W.Va. 497, 81 S.E.2d 237 (1954) (defendant widely circulating letters charging that plaintiff attorney was a "shyster" who had betrayed the interests of his client). *See also Prucha v. Weiss*, 233 Md. 479, 197 A.2d 253, *cert. denied*, 377 U.S. 992, 84 S.Ct. 1916, 12 L. Ed.2d 1045 (1964). In *Stansbury v. Beckstrom*, supra, it was specifically held that the United States Supreme Court's decision in *Organization For A Better Austin v. Keefe*, supra, precluded an order granting an injunction against a defendant patient who was protesting a bill she received from her physician by parading in front of his office displaying libelous signs. The Texas Court of Appeals noted in *Stansbury* that "[t]here can be no justification for the utterance of a slander. It cannot be too strongly condemned. . . . But there is no power in courts to make one person speak only well of another. The Constitution leaves him free to speak well or ill; and if he wrongs another by abusing this privilege, he is responsible in damages or punishable by the criminal law." *Stansbury v. Beckstrom*, supra at 949 (citations omitted). The decree of the court below is thus contrary to well-settled decisional law.

The principal reasons behind the general rule that defamation will not be enjoined are threefold.[3] First, it has been said that an injunction should not issue in such a situation because an adequate remedy at law is available. *Baltimore Life Ins. Co. v. Gleisner*, supra; *Kidd v. Horry*, supra; *Greenberg v. DeSalvo*, supra. Second, an injunction has been universally held to be an inappropriate remedy for defamation because the defendant's right to trial by jury on the issue of the defamatory nature of the publication is precluded thereby. *Baltimore Life Ins. Co. v. Gleisner*, supra; *Kidd v. Horry*, supra. Finally, injunctive relief for libel and slander has been denied because the injunctive relief inhibits the constitutional guarantee of freedom of speech, thereby imposing an unconstitutional prior restraint on that right. *Organization For A Better Austin v. Keefe*, supra; *Stansbury v. Beckstrom*, supra. *See also Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). It is patently apparent that the injunction issued in the case at bar is violative not only of the general rule that equity will not enjoin a defamation, but also of each of the aforementioned reasons for the rule. The court below, in deciding that appellant's statements were not true, precluded a jury determination of that issue. Furthermore, an adequate remedy at law is available in this case, in the form of an action for damages. Additionally, the injunction decreed unquestionably imposes a prior restraint on appellant's constitutional right to freedom of speech.[4] *See*

3. Originally a fourth objection to injunctive relief from defamation was often mentioned: that equity would not take jurisdiction where purely personal rights were involved. However, this reason was effectively discarded in *Everett v. Harron*, 380 Pa. 123, 110 A.2d 383 (1955), wherein it was held that equity will protect personal rights by injunction on the same conditions upon which it will protect property rights by injunction.

4. Not only the United States Constitution but also the Pennsylvania Constitution dictates this conclusion: "Article I, Section 7 of the Pennsylvania Constitution . . . was designed to . . . prohibit the imposition of prior restraints upon the communication of thoughts and opinions, leaving the utterer lia-

*Organization For A Better Austin v. Keefe,* supra; *Stansbury v. Beckstrom,* supra.

I am particularly troubled by the majority's treatment of the question of an adequate remedy at law in this case. The majority first notes that damages are particularly difficult to prove in a defamation case. The majority opinion then observes that the defendant was indigent and concludes that the combination of these factors makes the remedy at law inadequate. While I can agree that proof of damages in a defamation case is a difficult task I am unprepared to state that because proof of damages is difficult an action for defamation at law is inadequate. If this proposition were followed to its logical conclusion, all defamation cases could initially qualify for equitable relief. This is not the law, however, as is noted supra. Moreover, appellees made no attempt to establish their actual damages at the hearings below and did not show that they could not be adequately compensated by damages at law. There is no evidence of record to establish that damages were irreparable, substantial, actual or continuing. All that is present on the record is the lower court's conclusion that appellant's activities *could* give rise to damages. While I agree with the accuracy of this observation I am unable to conclude that the possibility of damages may serve to substitute for proof thereof. *See Annot.* 47 A.L.R.2d 695, 725–26 (1956).

The majority also states that "we cannot disregard the fact that in the present case an action for damages would be a pointless gesture since the defendant is indigent." I simply cannot accept the proposition that the presence of an impecunious defendant in the case renders an otherwise adequate remedy at law inadequate. To so hold would be to create a ground for equity jurisdiction based on the defendant's wealth or lack of it. I do not believe that this distinction is the law of our Commonwealth nor

ble only for abuse of the privilege." *William Goldman Theatres, Inc. v. Dana,* 405 Pa. 83, 88, 173 A.2d 59, 62, *cert. denied,* 368 U. S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961).

do I think it should be. To the contrary, the law is well-settled that the fact that the appellant-defendant is insolvent, and that, therefore, a judgment at law might be uncollectible, is not a sufficient basis for the interdiction of equity. *See Heilman v. Union Canal Co.*, 37 Pa. 100, 17 L.I. 356 (1860); 18 P.L.E. Injunction § 26 (1959); 42 Am.Jur.2d Injunctions § 135 (1969). As I have noted above, the *only* basis here relied on for a finding that no adequate remedy at law was available was the defendant's indigency. The fact that damages are difficult to prove is not a proper additional basis for that conclusion. Moreover, even if indigency alone *were* a basis for a distinction, I would still not agree. There is scant evidence of record that appellant was in fact indigent other than the fact that she was represented by legal services counsel.

The rule that equity will not enjoin defamation is not without limited exception. Equitable jurisdiction to interdict libelous publication has been assumed under some circumstances, such as where the libel or slander is accompanied by coercion, breach of trust or violence, *see Gariepy v. Springer*, supra, where there is a conspiracy to maliciously injure a plaintiff's business or property, *see E. M. W. Bar Corp. v. Hilliard*, 20 Pa.D. & C.2d 435 (C.P.Phila.1959); *Downey v. United Weatherproofing, Inc.*, 363 Mo. 852, 253 S.W.2d 976 (1953), where a labor dispute is involved, *see Wortex Mills, Inc. v. Textile Workers Union of America, C.I.O.*, 369 Pa. 359, 85 A.2d 851 (1952), where a right to privacy is invaded, *see Hibbs v. Neighborhood Organization to Rejuvenate Housing*, 433 Pa. 578, 252 A.2d 622 (1969), *but cf. Organization For A Better Austin v. Keefe*, supra, *see also Garcia v. Gray*, 507 F.2d 539 (10th Cir. 1974), or where the activity becomes a traditional nuisance, *see Kershes v. Verbicus*, 36 Pa.D. & C. 499 (C.P.Phila.1939). Evidence of the above factors is, however, undeveloped in the instant case and I dissent vigorously from the majority's creation of a new exception based on the defendant's indigency.

Nor am I convinced that appellant's activities were properly enjoined because her publication was accomplished in conjunction with picketing. Initially, it must be noted that predominant purpose and effect of the instant decree was to *enjoin defamation,* not *to halt unlawful picketing.* While *unlawful* picketing may be restrained, *1621, Inc. v. Wilson,* 402 Pa. 94, 166 A.2d 271 (1960); *Wortex Mills, Inc. v. Textile Workers Union of America, C.I.O.,* supra, perfectly *lawful* picketing, unaccompanied by violence or violation of clearly defined law or public policy of the state is a constitutionally protected activity which could not justify the lower court's decree. *See Organization For A Better Austin v. Keefe,* supra; *Altemose Construction Co. v. Building & Construction Trades Council of Philadelphia and Vicinity,* 449 Pa. 194, 296 A.2d 504, *cert. denied,* 411 U.S. 932, 93 S.Ct. 1901, 36 L.Ed.2d 392 (1972); *Hibbs v. Neighborhood Organization to Rejuvenate Housing,* supra. *See also Maple Corp. v. Briggman,* 53 Pa.D. & C.2d 296 (C.P.Phila.1971) (Spaeth, J.). There is no evidence in the present case that appellant's activities were accompanied by violence, coercion or other unlawful behavior. Moreover, it may not be said that her demonstration violated clearly defined law or public policy. The decree below enjoining appellant from defaming appellees may, therefore, not be upheld on the theory that the picketing accompanying the publication was enjoinable.

I would vacate the decree of the court below.

HOFFMAN and SPAETH, JJ., join in this dissenting opinion.